UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF A
BLACK AND SILVER APPLE IPHONE
CURRENTLY BEING HELD AS EVIDENCE
BY THE METROPOLITAN POLICE
DEPARTMENT, CURRENTLY LOCATED
AT 1805 BLADENSBURG ROAD, NE

Misc. No. _____

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Detective Sergeant Michael Boland, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— a black and silver Apple iPhone which is currently in law enforcement possession, and the extraction from that property of electronically stored information as described in Attachment B. I am a Detective Sergeant with the Metropolitan Police Department (MPD), and have been since 2011.

2.     I have been a sworn member of MPD for over sixteen years, and I am currently assigned as a Detective Sergeant within the Fifth District Detectives Office. I have received specialized training in the criminal laws of the District of Columbia, the detection of the violation of those laws, and the apprehension and prosecution of those responsible for violations. My training has included police officer training courses, various firearms- and narcotics-related training courses, and continuous in-service training on a yearly basis that has included updates on laws as they pertain to search and seizure.

3.      During my experience as a police officer, I have been involved in over one hundred arrests for gun violations, narcotics offenses, and other violations of the law. I have also conducted and/or participated in numerous investigations of both misdemeanor and felony offenses; and have executed or participated in over one thousand search warrants in which arrests were made with firearms, narcotics, money, and other types of contraband, were recovered.  I have interviewed hundreds of suspects, witnesses, police officers, and expert witnesses regarding patterns of criminal activity in the District of Columbia.

4.      Based on my experience with individuals who are known to conduct criminal acts in a group of two or more, in most cases they require some type of communication to carry out their objective.  That communication may be face to face, or through an electronic device such as a cellular telephone or pager.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.      The property to be searched is a black and silver iPhone, hereinafter the "Device."

7.      The Device is currently located at 1805 Bladensburg Road, NE, in the custody of the Fifth District Police Department Evidence Unit.

## PROBABLE CAUSE

8.      On November 15, 2017, at approximately 1:46 p.m., MPD officers responded to 301 P Street NW, Washington, D.C. for an armed robbery that had just occurred. Upon arrival, patrol officers located the Complainant.

9.      The complainant stated that he was at 301 P Street NW, Washington, D.C., the All in One Market, refilling the Automated Teller Machine (ATM) with money. The

complainant stated that he placed $4,000.00 in United States currency into the machine. Additionally, the complainant had approximately $87,000.00 in United States currency with him in a blue backpack with unknown initials on it. The complainant stated that he left the location to continue on his route. The complainant was picking up trash off the sidewalk in front of the All in One Market when he was approached from behind by two suspects. Suspect One struck him on the back of the head with what he believed to be a handgun causing him to fall to the ground. The complainant and both suspects then engaged in a struggle over the backpack. The suspects were able to overpower the complainant and obtain the backpack. The suspects fled northbound on 3rd Street NW and into the 200 block of Bates Street NW with the complainant unsuccessfully giving chase.

10.     The complainant called 911 and MPD officers arrived on the scene shortly. MPD officers obtained video surveillance footage from 301 P Street NW (Video 1) which depicted the attack and corroborated the complainant's version of the incident. A timestamp of the event displayed the time of 13:44, on November 15, 2017. MPD officers also obtained video surveillance footage from the 200 block of Bates Street NW (Video 2) which depicted both suspects entering an older silver Ford, and fleeing westbound on Bates Street NW in the vehicle. The suspect vehicle appeared to be a silver in color Ford, bearing Maryland "War of 1812" tags, with five-spoked hubcaps, a spoiler, and a single rain visor on the rear driver's-side window.

11.     Suspect-1, as observed in both videos, is described as a black male, medium complexion, average build, wearing a gray hooded sweatshirt, blue jeans, white and red gloves, and gray New Balance sneakers. This suspect was observed on Video 2 entering the driver's seat

of the suspect vehicle, armed with what appeared to be a black handgun and holding the backpack taken from the Complainant.

12.     Suspect-2, as observed in both videos, is described as a black male, dark complexion, wearing a dark jacket and blue jeans.  Suspect-2 was observed entering the front passenger seat of the suspect vehicle in Video 2.  Suspect-2 also dropped his black ski mask while running to the referenced vehicle, as seen on Video 2.  The ski mask was recovered by members of the Department of Forensic Sciences as evidence.

13.     Also recovered at the scene was an LG cell phone which was located on the sidewalk on the east side of 3rd Street, NW, on the flight path taken by Suspect-1 and Suspect-2 as seen in the video surveillance.  Call logs were obtained from this cell phone showing that on November 15, 2017, the phone made seven outgoing calls to telephone number 202-256-1070.  One of the calls was made at 1:40 p.m, five calls were made at 1:41 p.m, and one call was made at 1:49 p.m.  The robbery occurred at approximately 1:46 p.m.  Subsequent investigation revealed that telephone number 202-256-1070 was associated with Dwonne Washington.

14.     After reviewing the video surveillance footage of the suspect vehicle in Video 2, MPD Detective Sakulich completed various law enforcement database checks. A query of the License Plate Reader system ("LPR") displayed a silver Ford Taurus passing the LPR located at North Capitol Street NE and Riggs Road NE travelling northbound at approximately 1:59 p.m., on November 15, 2017. This location is approximately 3.5 miles from the offense location. This vehicle was bearing the Maryland license plate 4CG4894.  It also had five-spoked hubcaps and a spoiler. A query of historical images of the vehicle showed the vehicle had a single rain visor on the driver's side rear window consistent with the suspect vehicle. Additionally, upon review of

the LPR photograph from North Capitol Street NE and Riggs Road NE, driver of the vehicle is observed wearing a gray sweatshirt similar to the one worn by Suspect 1 in Video 1 and Video 2.

15.     A law enforcement database query revealed the vehicle is registered to Dwonne Anthony Washington, with date of birth June 6, 1975, and Lori Wright with a date of birth September 12, 1962, with a registration address of 10600 Georgia Avenue, Silver Spring, Maryland.  A query was conducted for Dwonne Washington using MPD's Cobalt system.  Upon review, detectives believed Washington's previous arrest photograph strongly resembled Suspect-1 from the surveillance video based on his complexion, age, and other physical characteristics. The 2001 Ford Taurus registered to Dwonne Washington and Lori Wright has not been reported stolen.

16.     Members of MPD and Montgomery County, Maryland Police Department then responded to the registered address of the 2001 Ford Taurus. At that time, the vehicle was not located.

17.     At approximately 9:40 p.m. on the day of the armed robbery, MPD Detective Sergeant Grant and your affiant made contact with Witness-1. Witness-1 was shown a picture of the suspect vehicle from the footage recovered from Bates Street NW (Video 2). Witness-1 stated, "that's my husband car, why is my name on it?" Your affiant asked, "Who is your husband?" to which Witness-1 stated "Dwonne Washington." This Affiant then showed Witness-1 a picture of Suspect-1 from Video 2, at which time Witness-1 identified Suspect-1 as her husband, Dwonne Washington.

18.     On November 16, 2017, a D.C. Superior Court Judge issued an arrest warrant for Dwonne Washington. Dwonne Washington turned himself into the Montgomery County,

Maryland Police Department on November 16, 2017.  Additionally, on November 16, 2017, your

affiant along with Fifth District Detectives and members of the Montgomery County Police

Department executed a Maryland search warrant at Dwonne Washington's residence located at

10600 Georgia Avenue, Silver Spring, Maryland. Upon executing the warrant, members

recovered two pairs of Gray New Balance tennis shoes, a black and silver Apple Iphone, and a

pair of white gloves. Witness-1 stated that the black and silver Apple iPhone belonged to

Dwonne Washington.  Witness-1 also stated that Dwonne Washington's phone number is 202-

256-1070.  This evidence was taken to the Fifth District and placed on Evidence Book 2494.

19.     Law enforcement believes that the target device will contain evidence of the

planning and execution of the crime as well as assist law enforcement in identifying any yet to be

identified co-conspirators.

20.     The Device is currently in the lawful possession of the Metropolitan Police

Department, Fifth District, and stored at 1805 Bladensburg Road, NE.

## TECHNICAL TERMS

21.     Based on my training and experience, and information acquired from other law

enforcement officials with technical expertise, I know the terms described below have the

following meanings or characteristics:

a.  "Digital device," as used herein, includes the following three terms and their

respective definitions:

b.  A "computer" means an electronic, magnetic, optical, or other high speed

data processing device performing logical or storage functions, and includes any data

storage facility or communications facility directly related to or operating in conjunction

with such device.  See 18 U.S.C. § 1030(e)(1).  Computers are physical units of

equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

      c.  "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

      d.  "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

      e.  "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of

transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

f.    A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

g.    A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS

consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

h.   "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

i.   "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

j.   Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four

numbers, each in the range 0-255, separated by periods (e.g., 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      k.   The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      l.   "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

m.  "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

n.  "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

o.  "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an

encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

22.     Based on my training, experience, and research, I know that the Device, an iPhone, has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offenses under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

23.     As described above and in Attachment B, this application seeks permission to search for information that might be found within the Device. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Device for at least the following reasons:

a.     Individuals who engage in criminal activity, including violations of Title 18, United States Code, Section 1951, often coordinate with one another through text messages and phone calls to plan and execute the commission of the offenses. Additionally, individuals that

commit violations of referenced statute will often communicate regarding the distribution of proceeds after the event has been completed and will discuss the destruction and/or concealment of instruments of the crime.

        b.    In this investigation, it is believed that text messages, call logs, location information, and contact lists will assist law enforcement with identifying additional co-conspirators involved in the planning and execution of the crime.

        c.    Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

        d.    Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a

temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

      10.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

      a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the Device(s), not currently associated

with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

   b.    Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

   c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or

other forms of forensic evidence on a digital device that are necessary to draw an accurate

conclusion is a dynamic process.  While it is possible to specify in advance the records to be

sought, digital device evidence is not always data that can be merely reviewed by a review team

and passed along to investigators.  Whether data stored on digital devices is evidence may

depend on other information stored on the devices and the application of knowledge about how

the devices behave.  Therefore, contextual information necessary to understand other evidence

also falls within the scope of the warrant.

e.     Further, in finding evidence of how a digital device was used, the purpose of

its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not

present on the device.  For example, the presence or absence of counter-forensic programs, anti-

virus programs (and associated data), and malware may be relevant to establishing the user's

intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

11.     Based on my knowledge, training, and experience, as well as information related

to me by agents and others involved in this investigation and in the forensic examination of

digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often

requiring specific expertise, specialized equipment, and substantial amounts of time, in part

because there are so many types of digital devices and software programs in use today.  Digital

devices – whether, for example, desktop computers, mobile devices, or portable storage devices

– may be customized with a vast array of software applications, each generating a particular form

of information or records and each often requiring unique forensic tools, techniques, and

expertise.  As a result, it may be necessary to consult with specially trained personnel who have

specific expertise in the types of digital devices, operating systems, or software applications that

are being searched, and to obtain specialized hardware and software solutions to meet the needs

of a particular forensic analysis.

      b.    Digital data is particularly vulnerable to inadvertent or intentional

modification or destruction.  Searching digital devices can require the use of precise, scientific

procedures that are designed to maintain the integrity of digital data and to recover "hidden,"

erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic

files from digital devices also requires specialized tools and often substantial time.  As a result, a

controlled environment, such as a law enforcement laboratory or similar facility, is often

essential to conducting a complete and accurate analysis of data stored on digital devices.

      c.    Further, as discussed above, evidence of how a digital device has been used,

the purposes for which it has been used, and who has used it, may be reflected in the absence of

particular data on a digital device.  For example, to rebut a claim that the owner of a digital

device was not responsible for a particular use because the device was being controlled remotely

by malicious software, it may be necessary to show that malicious software that allows someone

else to control the digital device remotely is not present on the digital device.  Evidence of the

absence of particular data or software on a digital device is not segregable from the digital device

itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or

software requires specialized tools and a controlled laboratory environment, and can require

substantial time.

      d.    Digital device users can attempt to conceal data within digital devices

through a number of methods, including the use of innocuous or misleading filenames and

extensions.  For example, files with the extension ".jpg" often are image files; however, a user

can easily change the extension to ".txt" to conceal the image and make it appear that the file

contains text.  Digital device users can also attempt to conceal data by using encryption, which

means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the

data into readable form.  Digital device users may encode communications or files, including

substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby

thwarting "keyword" search techniques and necessitating continuous modification of keyword

terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend

themselves to keyword searches.  Some applications for computers, smart phones, and other

digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-

text format.  Documents printed by a computer, even if the document was never saved to the

hard drive, are recoverable by forensic examiners but not discoverable by keyword searches

because the printed document is stored by the computer as a graphic image and not as text.  In

addition, digital device users can conceal data within another seemingly unrelated and innocuous

file in a process called "steganography."  For example, by using steganography a digital device

user can conceal text in an image file that cannot be viewed when the image file is opened.

Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are

not scrupulously followed.  A substantial amount of time is necessary to extract and sort through

data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence,

contraband or instrumentalities of a crime.

      e.    Analyzing the contents of mobile devices, including tablets, can be very

labor intensive and also requires special technical skills, equipment, and software.  The large,

and ever increasing, number and variety of available mobile device applications generate unique

forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

    f. Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

g.    In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.    The digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel, sometimes with the aid of a technical expert, in an appropriate setting, in order to extract and seize the information, records, or evidence described in Attachment B.

2.    The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.    In searching the digital devices, the forensic examiners may examine as much of the contents of the devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the

digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

12.     Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## CONCLUSION

13.     I respectfully submit that this affidavit supports probable cause for a warrant to search the black and silver Apple i-Phone described in Attachment A and to seize the items described in Attachment B.


Respectfully submitted,


_____
Detective Sergeant Michael Boland
Metropolitan Police Department


Subscribed and sworn to before me
on December 19, 2017:

_____
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

*Property to be searched*

The property to be searched is a black and silver Apple i-Phone, hereinafter the "Device." The Device is currently located at the Metropolitan Police Department 5th District at 1805 Bladensburg Road, NE.

## ATTACHMENT B

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities of violations of 18 U.S.C. § 1951, including, but not limited to:

**a.  Records and information relating to a conspiracy to rob Complainant, including but not limited to call logs and text messages;**

**b.  Records and information relating to the identity or location of perpetrators, aiders and abettors, coconspirators, and accessories after the fact of the robbery that occurred on November 15, 2017, including but not limited to call logs and text messages;**

**c.   Evidence of who used, owned, or controlled the Device such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;**

**d.   Evidence of the attachment to the Devices of other digital devices or similar containers for electronic evidence;**

**e.  Evidence of the times the Device was used;**

**f.  Information stored on the Device that may be necessary to access the Device or to conduct a forensic examination of the Device;**

g.   **Records of or information about Internet Protocol addresses used by the Device;**

h.   **Records of or information about the Device's Internet activity, related to the above offenses, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.**